## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

**AMANDA LYNN LIVELY,**

DEC 1 3 2010

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**Plaintiff,**

v.

**Civil Action No. 1:09cv144
(The Honorable Irene M. Keeley)**

**MICHAEL ASTRUE,
Commissioner of Social Security,**

**Defendant.**

### REPORT AND RECOMMENDATION/OPINION

Amanda Lynn Lively ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

### I. Procedural History

Plaintiff filed an application for SSI on December 14, 2006, alleging disability since December 1, 2006 (R. 106). Plaintiff's applications were denied at the initial and reconsideration levels (R. 73, 79). Plaintiff requested a hearing (R. 83), which Administrative Law Judge Randall W. Moon ("ALJ") held on September 22, 2008, and at which Plaintiff, represented by counsel, and Eugene Chuchman, Vocational Expert ("VE"), testified (R. 28). On April 6, 2009, the ALJ entered

a decision finding Plaintiff had severe impairments, namely degenerative disc disease of the lumbar spine, obesity, major depression and anxiety, but was not disabled because considering her age, education, work experience and residual functional capacity, she would be capable of making a successful adjustment to other work that existed in significant numbers in the national economy (R. 25, 26 ). On April 28, 2009, Plaintiff requested review of the ALJ's decision by the Appeals Council (R.10). On August 27, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R.  1-5).

## II. Statement of Facts

Plaintiff was born on April 4, 1980, and was 26 years old on her alleged onset date, and 29 at the time of the ALJ's decision (R. 24).  As such she was at all times relevant to this decision a younger person as defined by 20 C.F.R. § 416.963.  Plaintiff completed the 12th grade (R. 131).  She also attended West Liberty State College for one semester before dropping out because, as she once stated, she hated it and did not go to class (R. 242).

Plaintiff's earnings record shows annual earnings between 1996 and 2000 of $680.00 to $912.00, and annual earnings between 2001 and 2006, of $69.17 to $1,523.45.  There were no reported earnings for 1999, 2002, 2004 or 2007 (R. 110).  Plaintiff last worked December 1, 2006, for two days as a dishwasher at Bob Evans (R. 127).  She stated to a Social Security employee on January 8, 2007, that ..."I could not do the job and I felt like everyone was watching me and I could not handle that feeling so I walked out."  Plaintiff worked as a cashier at Dollar General in 2001, for four months and she worked as a Deli Clerk in a grocery store in 2005. Plaintiff told the employee that she couldn't work because "I can't be around people, I get too upset too easy. I feel like everyone looks at me like I am stupid and I can't handle the jobs."

On Plaintiff's alleged onset date she had three children, 7-year-old twins (born in 1999) and

a 3-year old (born in 2003).

On April 13, 2003, Plaintiff was seen in the emergency department of Sistersville General Hospital. She stated she suddenly felt the sensation of passing out. It was hot and she was outside. She was (6) six months pregnant and dizzy with nausea (R. 174-176). She was treated and discharged in improved condition on the same date.

On June 25, 2004, Plaintiff was seen in the emergency department of Sistersville General Hospital with chief complaint of a sore throat. She was diagnosed with Pharyngitis (R. 180-183).

On August 12, 2004, Plaintiff was seen in the emergency department of Sistersville General Hospital with complaints of lower back pain and breakthrough bleeding after a Depo-Provera (contraceptive) shot. Her diagnosis was PID - Pelvic Inflammatory Disease (R. 185-188).

Plaintiff was seen in the emergency department of Sistersville General Hospital on September 16, 2004, because she fell down the stairs in her home and had complaints of ankle swelling. An x-ray was taken of her right ankle and compared to a previous study of June 30, 1998. The x-ray revealed no fracture, dislocation or other abnormality. An air splint was applied to her ankle. She was given Vicodin and discharged with a sprained right ankle (R. 193-198).

Plaintiff was seen in the emergency department of Sistersville General Hospital on November 28, 2004, with complaint of an infected tooth in the lower jaw. She was instructed to follow-up with a dentist and given Vicodin and Amoxicillin (R.199-202).

Plaintiff was seen in the emergency department of Sistersville General Hospital on December 29, 2004, with complaints of back pain since having an epidural when she had a baby 18 months earlier (R. 204-208).

Plaintiff was seen in the emergency department of Sistersville General Hospital on April 15,

2005, with complaints of tooth pain in the left bottom molar. Plaintiff was instructed to go to the dental clinic at Ruby Memorial (R. 209-214).

Plaintiff was seen in the emergency department of Sistersville General Hospital on December 12, 2005, by Billy Martin, D.O., and he diagnosed contusion of the lower back (R. 216-217).

Plaintiff was seen in the emergency department of Sistersville General Hospital on September 25, 2006, with complaint of dental pain (R. 222-226).

Plaintiff was seen in the emergency department of Sistersville General Hospital on October 9, 2006, with complaint of back pain since delivery of her child (3) three years ago and having recently picked up a child that weighed approximately 100 pounds. She was prescribed Toradol. An x-ray of her lumbar spine was negative for fracture (R. 227-232).

Dr. S. Chandrasekhar's office note dated October 23, 2006, indicates 3 yrs low back pain (hadn't had MRI), left foot pain/knot and refills anxiety medication. Vicodin and Soma were prescribed (R. 399).

Dr. S. Chandrasekhar's office note dated November 22, 2006, indicates low back pain. Plaintiff stated she was working at a Bob Evans Restaurant.[1] She was to continue physical therapy (R. 398).

Plaintiff filed for SSI benefits on December 14, 2006, alleging disability as of December 1, 2006.

On January 1, 2007, Plaintiff wrote on her Function Report for SSA:

> I've dealt with this problem for many years but it has gotten worse. I was on nerve medicine when I was three years old and I tried to

---

[1]Plaintiff later reported she had worked at the Bob Evans for two days as a dishwasher before quitting due to a panic attack.

overdose when I was 17. I've been to counselors and therapists and I've been on many different medicines. I am now separated from my husband and am a single mom with 3 kids. I tried to work because I knew I had to but I couldn't do it. I had a panic attack and I left knowing I had no other income. I truly feel I cannot work at this time. I get physically ill just thinking about being around people.

(R. 140)

Plaintiff said in the report that she is in a constant state of worry (R. 139). She wrote that her daily activities consisted of waking up at 6:45 to get her older girls ready for school and then going back to bed until her youngest woke up. She would usually then sit on the couch and watch TV. She did homework with her girls and put them to bed around 8:00 p.m. She stated that she could not sleep at night. She prepared meals daily which consisted of sandwiches and french fries, but stated there had been no changes to her cooking habits since her conditions began. She stated that she was able to clean house and take care of her three young children (R. 135).

X-rays of Plaintiff's right and left feet on January 9, 2007, revealed asymmetrical bilateral OS tibiale externum accessory bones related to the tarsal navicular bones bilaterally which were stated to be a normal variant (R. 238).

Dr. S. Chandrasekhar's office note dated January 22, 2007, indicates Plaintiff was seen with complaints of lower back pain. She was to continue physical therapy and was referred for an MRI (R. 397).

Dr. S. Chandrasekhar's office note dated March 22, 2007, indicates Plaintiff was seen on follow-up for her back. Vicodin and Norflex were prescribed (R. 396).

An MRI of the lumbar spine was taken on March 25, 2007, and revealed spinal canal stenosis at L2-L3 through L4-L5 largely relating to facet arthropathy, with shallow broad-based disc bulges at L3-L4 and L4-L5 contributing minimally to the spinal canal stenosis. The most significant finding

was a broad-based disc protrusion at L5-S1 which resulted in bilateral neural foraminal stenosis (R. 235).

A Mental Examination was conducted by M. Aileen Mansuetto, M.A., for the State Disability Determination Service ("DDS") on March 29, 2007 (R. 239-243). Ms. Mansuetto reported that Plaintiff was 5'6" and weighed 220 pounds. She smoked two packs of cigarettes a day and drank a six-pack of Mountain Dew per day. She stated: "I tried to work this last time. I had a panic attack. I'm not lazy and I can do the work, but being around people, I get nauseous." She stated that her symptoms had worsened during the past year or so.

Ms. Mansuetto found the plaintiff independent in all activities of daily living. She took care of her children and her home and was able to manage her own finances. She received $500 a month in food stamps and $30 a month in a utility check. "She gets no financial assistance from the State, as she has used her allotted welfare money." Plaintiff told Ms. Mansuetto that her mother helped her financially (R. 242).

Plaintiff had had no inpatient therapy and was not being treated by a mental health provider. She was prescribed Wellbutrin and Lorazepam, and recently Prozac by her primary care physician.

Upon Mental Status Examination, Plaintiff was cooperative and polite and her speech was relevant and coherent. She was fully oriented. Her mood was sad, depressed, and anxious, and her affect was flat. Her concentration was mildly deficient. Psychomotor activity was normal, and there was no evidence of delusions, obsessions, compulsions, hallucinations or illusions. Her judgment was adequate. She did have suicidal/homicidal ideations. Her immediate memory and remote memory were normal, and recent memory was moderately deficient. Persistence was normal as was pace. Regarding Social Functioning, Ms. Mansuetto opined that during the examination Plaintiff was within normal limits with good eye contact and appropriate social skills. Although she was mild

6

mannered and anxious she was socially appropriate.

Ms. Mansuetto noted:

> The claimant does not leave her home for extended periods of time. This is caused by her fear of having a panic attack in public. She experiences shortness of breath, feeling emotionally overwhelmed, sweating and other physiological difficulties, thus, meets the diagnostic criteria for panic disorder with agoraphobia. The claimant also shows depressive symptomatology with poor concentration, excessive crying, down and despondent mood most days, poor libido, anhedonia, suicidal ideation, and excessive crying. This meets diagnostic criteria for major depressive disorder . . . .
>
> The claimant is independent in all activities of daily living. She takes care of her children and her home.

Her Diagnostic Impression was Panic Disorder with agoraphobia and Major Depressive Disorder, moderate, recurrent. Her prognosis was guarded, but may improve if she participated in therapy.

State Agency psychologist Philip E. Comer, Ph.D., prepared a Mental Residual Functional Capacity Assessment ("MRFC") and Psychiatric Review Technique ("PRT") report each dated April 4, 2007. He found Plaintiff would be "moderately limited" in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; and ability to travel in unfamiliar places or use public transportation (R. 244-246). She was not markedly limited in any area, and would not be significantly limited in any other functional area.

Under "Functional Capacity Assessment," Dr. Comer concluded Plaintiff's functional limitations did not exceed moderate and did not call for an RFC allowance. He opined she appeared to have the mental and emotional capacity for work-related activity in a low stress/demand work environment that had minimal interpersonal/social/travel requirements (R. 246).

In his Psychiatric Review Technique ("PRT"), Dr. Comer opined Plaintiff had an affective disorder and an anxiety disorder (R. 248-260). He opined Plaintiff would have a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and had had one or two episodes of decompensation, each of extended duration (R. 258). He concluded: "Claimant's diagnoses and concomitant limitations do not meet or equal listings but do call for an RFC assessment. Her statements are reasonably consistent with CE and are credible from her perspective" (R. 260).

Dr. S. Chandrasekhar's office note dated April 10, 2007, indicates Plaintiff was seen to review the MRI report of March 25, 2007. The assessment was spinal stenosis (R. 395). Dr. Chandrasekhar referred Plaintiff to neurologist Dr. Bailes (R. 463).

Dr. S. Chandrasekhar's office note dated May 17, 2007, indicated Plaintiff needed Vicodin, and her EMG was rescheduled to June (R. 394).

An EMG performed on June 22, 2007, indicated:

> This is a 27-year-old right handed female, with no allergies, on Prozac 40 mg qd and Vicodin-ES 7.5 mg, with complaints of low back pain, ongoing for about three years with pain radiating into the right buttock and down the right lateral leg, generally not below the knee. She has some sense of occasional right leg tingling or numbness. There is no history of diabetes. She has been a one pack per day cigarette smoker for ten years.

Impression:

1. Normal right peroneal and tibial mixed nerve conduction study - no evidence of neuropathy.

2. Query right L4 Radiculopathy, chronic.

Plaintiff was seen by Dr. Charles Rosen, M.D., for a neurosurgical evaluation on June 25, 2007 (R. 465-466). Plaintiff stated that she had low back pain that started approximately three years earlier. She could not associate the pain to a specific injury but believed it started after her second delivery. She was referred to physical therapy about four or five months earlier but did not feel she received any benefit and discontinued therapy. Medications included Prozac and Vicodin which she was taking up to three times a day, noticing a decrease in the benefits over the past few months. Dr. Rosen opined Plaintiff's MRI showed mild degenerative changes but no evidence of root compression (R. 465). He opined the Plaintiff did not need neurosurgical intervention and that she would benefit from "structured physical therapy that uses active modalities only." She would also benefit from weight loss and smoking cessation. He advised Plaintiff to use over-the-counter anti-inflammatories and because of tolerance issues to limit her narcotic intake (R. 466).

Dr. S. Chandrasekhar's office note dated July 18, 2007, indicated anxiety attacks and low back pain (R.393).

On July 20, 2007, Plaintiff wrote on her Function Report for SSA:

> I do not feel that I can work at this time. I get nervous and have panic attacks and I feel like I am having a heart attack. I have three kids to take care of and I don't know how I am going to do it. I need help. It is in my medical records that I have been dealing with this all my life and I am lost. I don't know what I am supposed to do (R. 159).

Plaintiff noted that there had been a change in her condition since the January 1, 2007, report. She stated that on April 10, 2007, she was diagnosed with a herniated disc in her back and two

bulging discs. She could not stand for long periods of time or lift heavy objects (R. 143). She stated that she was on medicine for her nerves when she was (5) five years old and has received medication over the years (R. 144). In 1998, she took a lot of pills out of her mother's medicine cabinet and her stomach was pumped at Sistersville General Hospital. She noted that she was also seen at Sistersville General Hospital for lower back pain (R. 144-145). Her medications were listed as Depo-Provera (contraceptive), Norflex, Prozac and Vicodin. She stated that there had been no changes in her daily activities since she completed her last disability report (R. 146). However, she stated that her neighbor came and cooked for her (R.154).

Dr. S. Chandrasekhar's office note dated August 23, 2007, indicates Plaintiff was seen for Depo Provera (R. 392).

Dr. S. Chandrasekhar's office note September18, 2007, indicated Plaintiff wished to change from Lexapro back to Prozac due to irritability/edginess (R. 391).

Plaintiff was seen by Thomas J. Schmitt, M.D., on September 25, 2007, for evaluation of orthopedic status (R.262-266). He first noted Plaintiff's speech and gait were normal, and she did not need an assistive device to ambulate. He noted:

> The patient has a four year history of lumbar pain radiating to the left lower extremity in sciatic distribution. She complains of arthralgias of the ankles. She rates her pain on a scale of 10/10+ at the worst and 5/10 at the best. She further alleges disturbed sleep pattern secondary to the pain. Left leg buckles several times a week on ambulation. There is no history of deformities nor has there been any heat, redness, swelling, enlargement, effusion, morning stiffness, or tenderness in any joint. The patient further alleges that bending, stooping, sitting or standing for prolonged periods aggravate the low back pain. The patient has had no precise history of injury but has had a history of heavy yard work in her younger years to the present date. No surgery has been performed.

Plaintiff's current medications were Vicodin and Prozac. Her past medical history was

positive for panic disorder, anxiety, back pain, L5/S1 bulging disc with stenosis, L2/3 through L4/5 canal stenosis with facet arthropathy, and L3/4 and L4/5 disc bulge. Plaintiff could get on and off the examining table with mild difficulty. She could walk heel to toe, squat, and hop with moderate difficulty. Her gait was normal. Straight leg raise was positive at 40 degrees on the right and 50 on the left in both sitting and supine positions. Range of motion was full in all joints with the exception fo the lumbar spine where flexion was limited. Dr. Schmitt noted:

> The patient has a history of back problems from an early age. She has had no surgery. MRI dated 3/25/07, has demonstrated severe degenerative disc disease at all levels of the lumbar spine as well as canal stenosis of L4/5 and disc protrusion at L5/S1. The patient's range of motion is severely limited in activities of daily living.

Dr. Schmitt's impression was that the Plaintiff had severely limited range of motion of lumbar spine; herniated disc at L4/5; severe degenerative disc disease at all levels of the lumbar spine with right neural foraminal stenosis L5/S1; and severe limitation in ambulatory activities for daily living (R. 264).

On October 19, 2007, Cindy Osborne, D.O., a State agency reviewing physician, completed a Physical Residual Functional Capacity Assessment (R. 268-273). Dr. Osborne opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk about 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday. Her ability to push and/or pull (including operation of hand and/or foot controls) was unlimited other than as shown for lifting and/or carrying. She could occasionally climb ladders, ropes or scaffolds and perform all other postural movements. She should avoid concentrated exposure to cold, vibration and hazards. It was noted under additional comments: "New Condition - Bulging Disks and a Herniated Disk." (R. 275). Based on the medical and non-medical information in the record, Dr. Osborne found Plaintiff

mostly credible (R. 273). Plaintiff's RFC was reduced to light with postural and environmental limitations (R. 160).

Dr. S. Chandrasekhar's office note dated November 19, 2007, indicates Plaintiff was seen for prescription refills, Depo, Vicodin ES, Norflex and Prozac (R. 418).

Dr. S. Chandrasekhar's office note dated February 19, 2008, indicates Plaintiff received a Depo Provera injection. There is a notation dated 04/24/08 at the bottom of this office note that states: "Call from Karen Lively who reports Amanda is selling Vicodin" (R. 390).

Plaintiff was admitted to the crisis unit of Northwood Health Systems on February 21, 2008, reporting acute levels of depression, anxiety, blunted affect, worthlessness, hopelessness, helplessness, change in appetite, and poor judgment with severe levels of suicidal ideations. She stated she felt isolated and was crying all of the time. There were relationship problems with her ex-husband over money and she stated she had "no income." She was fighting with her ex-husband but refused to give further detail about the situation (R. 280-81). Her estimated length of stay was 7-10 days (R. 288). It was noted that Plaintiff had been admitted to Northwood Health Systems seeking treatment for depression in March 2001, and was receiving counseling at Wellsprings (R. 276). She was currently taking Prozac and Buspar (R. 309). It was also noted that Plaintiff reported having smoked one joint of marijuana that morning. The admission diagnosis was Major Depression, Recurrent, Severe, without Psychosis. No physical problems were noted.

Four days after her admission Plaintiff reported "feeling better" and her mood was good with no anxiety or mood swings. Her mood was euthymic, her affect appropriate, and she had normal eye contact and speech. Her concentration, depression, and judgment were improved and she denied feelings of worthlessness, hopelessness, and crying. She was sleeping well at night and felt the

BuSpar had helped. She missed her children and was ready to go home (R. 298, 300).

The next day Plaintiff reported "less anxiety" and appreciated her family more. She had no problems with sleep (R. 302).

By February 27th, six days after admission, she no longer had suicidal thoughts, did not feel depressed, had good concentration, reported sleeping at least 8 hours, and left Northwood (against advice of her counselor). Despite her self-reports to the contrary, the note from that date states Plaintiff continued to display problems with severe depression and anxiety; moderate social withdrawal; impulsivity; poor judgment; a blunted affect; agitation; low energy; poor appetite and sleeping patterns; and lack of motivation (R. 316).

Plaintiff reported feeling depressed when seen by Certified Nurse Practitioner Monica Smith, on March 7, 2008. Ms. Smith opined Plaintiff was not a danger to herself or others and determined there was a need for psychotropic medications. Prozac, BuSpar and Trazadone were ordered (R. 318).

A therapy note dated March 28, 2008, indicated the Plaintiff's mood was anxious and her progress was "slow but steady," in large part due to anxiety over filing divorce papers against her husband. Plaintiff reported she kept herself busy with scheduled appointments and with caring for her daughters. Plaintiff described her anxiety as moderate to severe as she continued to struggle with filing divorce papers, stating that the primary reason for her anxiety was "not knowing if the divorce would happen or not." She was distracted by thoughts of what her husband would do if she filed for divorce. Effective strategies for managing her symptoms were discussed(R. 320).

An evaluation was performed on April 4, 2008, by nurse practitioner Monica Smith, who stated:

> Client reports being on Prozac for five years. BuSpar was added in February 2008 and Trazadone in March. She reports difficulty sleeping, gets five hours a night. She reports Prozac is helping the depression but she continues to be mildly depressed. BuSpar is controlling anxiety. She has mild to moderate anxiety. She reports no problems with focus or concentration but she does lack energy and motivation. She denied any suicidal or homicidal thoughts. She reports racing thoughts and mood swings. She reports she's easily angered and irritable. She denies paranoia or hallucinations. She continues to isolate and withdraw from people.

Ms. Smith's assessment was major depressive disorder, recurrent, severe, without psychosis, and "back injury." Her treatment plan included discontinuation of Prozac, starting Effexor, discontinuing Trazadone and a seven day trial of Rozerem for sleep.

A therapy note dated April 11, 2008, indicated Plaintiff's mood was anxious and her progress was "slow but steady." She had been "keeping busy by caring for her children, cleaning house." She also worried about how her husband would react to the divorce and how he would get even. Plaintiff wanted to work on her self esteem (R. 324).

Plaintiff reported increased restlessness and irritability with Effexor on April 23, 2008. Monica Smith opined Plaintiff was not a danger to herself or others and determined there was a continued need for psychotropic medications. She discontinued Effexor and Trazadone (R. 325).

As previously noted, a notation on an office visit note for Dr. Chandrasekhar dated 04/24/08 states: "Karen Lively who reports Amanda is selling Vicodin" (R. 390).

On April 25, 2008, Plaintiff told her clinician that her twin girls were "big handfuls" and that they kept her busy. Instead of dealing with her problems she ignored them by keeping herself busy. She also reported by overwhelmed by child care issues.

On May 9, 2008, Plaintiff reported she was sleeping well, but felt anxious.

On May 30, 2008, Plaintiff was noted to be "in good spirits" (R. 360).

14

On June 27, 2008, Plaintiff reported sleeping well, and stated she had not had much trouble with her relationships. She was instructed to start Depakote.

In July 2008, Plaintiff reported "significant improvement" with her new medication.

Three weeks later, she reported having no difficulties; sleeping well; having normal mood and energy; feeling better with less frequent mood swings, less irritability, and less anxiety; and having improved motivation and sleep.

On August 18, 2008. Plaintiff reported having no difficulties. She was sleeping well. Her energy was normal and her mood was normal. She had no medical problems. She had less frequent mood swings, less irritability and anxiety, and more energy and motivation. She was sleeping better. She had no suicidal or homicidal ideations and was in "good spirits."

Psychologist John Atkinson, M.A., performed a consultative examination of Plaintiff on referral of Plaintiff's attorney on September 10, 2008 (R. 328-338). His assessment was based on a clinical interview and mental status exam. Her chief reason for seeking disability was "um - - unipolar - - two bulging disks in my back." Mr. Atkinson noted there was no such medical diagnosis as unipolar. She also said she was disabled due to "um, - - - a panic attack, wouldn't be able to breathe, run out – avoid people – I can't stand and carry heavy things." She felt depressed most of the time, several times a week, even with medications. She denied smoking marijuana since age 19. Plaintiff told Mr. Atkinson she had quit college after two months because she "just wasn't getting up and going to class due to depression." She reported anxiety, feeling "like a heart attack" but these episodes only occurred about once a month, for about 15 or 20 minutes, "therefore, not really a problem." She did report irritability, "punch walls, being this way makes me mad, irritable with the kids." She reported such agitation about once a week and described her mood over the past two

weeks as depressed.

Mr. Atkinson found Plaintiff's attitude was wistful, subdued, preoccupied, and tense, and she was constantly jiggling her legs. Her cooperation was adequate, posture was sitting rigidly forward, and gait was normal. Her social rapport was tentative. Her mood was subdued and depressed and her affect diminished. Her insight was average and her judgment normal. Her immediate and remote memory were normal, and her delayed memory was moderately impaired. Her concentration was moderately deficient, but her attention, reasoning, psychomotor behavior, persistence, and pace were all normal. Mr. Atkinson specifically stated under SOCIAL FUNCTIONING that Plaintiff's social functioning was mildly deficient during the interview based on observation of social interaction. He then noted:

> In summary, we see here a 28-year-old female who I see as a constitutional schizoid - obsessive type personality, suffering from feelings of social alienation and who feels like she is in this world but not of this world. She engages in obsessive ruminative thinking with a lot of fantasies, feels misunderstood, unloved and worthless and this appears to be a constitutional predisposition. It is noted that individuals of this type almost always show a very low life force and the patient displays this clearly, being more of an introverted, rather colorless individual.
>
> The patient did go through a period of mild acting out as a teenager but after that, lapsed back into her withdrawn and somewhat seclusive, morose brooding. Individuals of this type almost always suffer from chronic depression, which the patient clearly displays and has always displayed, and this persists despite treatment.
>
> It is felt that the patient's problems have been lifelong and probably will continue to be in the foreseeable future and she simply lacks the get-up and go capabilities for normal social relationships, both at home, at school or at work. Her tolerance for stress and anxiety is very low and she withdraws under pressure; this being compounded by depressive avolition. Her impairments are felt to be significant and chronic.

Mr. Atkinson diagnosed Major Depressive Disorder - Recurrent, Severe without Psychotic Features and Schizoid-Obsessive Personality Disorder. He opined her GAF was 50.[2]

Significantly, Mr. Atkinson noted that the Northwood records were "problematic" because the "psychiatric evaluations," in particular that of April 4, 2008, were not performed by psychiatrists or medical doctors and lacked a doctor's signature (R. 330). They could not therefore be properly called psychiatric evaluations. He stated: "I know that complaints have been filed against Northwood by the Office of Behavioral Health for things like billing or psychiatric reports when no psychiatrist was involved in making the report, etc. I myself therefore take what they say with a grain of salt," although he did agree that Plaintiff had Major Depression, recurrent, severe.

Plaintiff's medications were listed as Hydroxyzine, BuSpar, Remeron, Wellbutrin, Celexa, Norflex and Depakote (R. 330). Mr. Atkinson stated: "It is not clear why she is taking Depakote because Depakote is a medication for migraine headaches and the patient states she has never had migraine headaches."

Mr. Atkinson completed a Mental Assessment of Ability to do Work-Related Activities form, opining that Plaintiff would have a "marked" limitation in her ability to relate to co-workers, deal with the public, deal with work stresses, and demonstrate reliability. A "marked" inability to function in an area is defined in the form as "severely limited but not precluded." Significantly,

---

[2]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

the form expressly instructed the evaluator to "Identify the factors that support your assessment," noting:

> IT IS IMPORTANT THAT YOU RELATE PARTICULAR MEDICAL FINDINGS TO ANY ASSESSED LIMITATION IN CAPACITY; THE USEFULNESS OF YOUR ASSESSMENT DEPENDS ON THE EXTENT TO WHICH YOU DO THIS.

Mr. Atkinson did not, however, relate any findings to any of the assessed limitations in the form.

On September 15, 2008, one week before the Administrative Hearing, Plaintiff denied depression or anxiety, and stated that the medication helped (R. 383). She was having no problems with her medications. Her attitude was pleasant, her affect normal, and she was well-groomed. She was instructed to continue her medications as prescribed. This office note was signed by a doctor.

During the administrative hearing held on September 22, 2008, Plaintiff testified that she lived in a second floor apartment with her three children and was separated from her husband. She had a five year old daughter and two nine year old daughters. She was 5'6" and weighed about 220 pounds (R. 35-37). She did not receive child support because her husband would not work. She had a valid driver's license but did not have a car. Her mother drove her to appointments and did her grocery shopping (R. 38). Her husband hadn't lived with her for three years (R. 39). She received $542.00 in food stamps a month as well as a $22 dollar check for her utilities each month. Her rent was income based and she received assistance with the rent.

Plaintiff testified she graduated from high school in 1998 and started classes at West Liberty State College but dropped out (R. 39-40). Her last employment was three years earlier as a dishwasher at Bob Evans but she had a panic attack and walked out after two days. Before that she worked at Sister Bill's Food/Foodland as a deli worker for about two months. She had to stop working there because she had no daycare and her husband was not working but would not watch

the kids.    Prior to that she worked at the Dollar General Store and Ames Department Store as a clerk (R. 41-42).

Plaintiff stated her back was her most serious problem that affected her ability to work.  She started having back problems four years ago.  She was not involved in an accident and did not know why she started having back pain.  She had physical therapy for her back about a year ago (R. 42-43).  Plaintiff testified that she was seen by a neurologist for her back and he said it was not bad enough for surgery yet.  He suggested physical therapy and weight loss.  Plaintiff has never been on any type of program to lose weight (R 45-46). Anxiety and depression also kept her from working (R 48).

Now that her children were back in school she normally got up at 6:45 to see them off to school.  Her children ate breakfast at school.  Once they left for school she would watch TV or do light housework/dust.  Her mother helped her one day a week and she saw her youngest brother about once a week.   Her mother did her grocery shopping for her every two weeks.  Plaintiff occasionally went grocery shopping with her mother but did not  like being around people in the store and rushed her mother to get out of the store (R. 51-52).  When her children got home from school she fixed dinner for them (R. 56).  She had no problem dressing herself.  Her mother did the vacuuming and her daughters took the sheets off of the bed.  She cooked (R. 60-61).  Plaintiff smoked a pack and a half of cigarettes a day.  Her mother bought them for her or she went without.  She tried to cut down on her smoking (R. 60).

The ALJ then asked the Vocational Expert ("VE") several hypotheticals, including the one on which he relied, that being light work with no more than occasional postural movements; no exposure to workplace hazards such as unprotected heights or dangerous moving machinery; no high production rate expectations; no sales quotas; and no more than occasional contact with co-workers,

supervisors or the general public. In response, the ALJ opined there would be a significant number of jobs in the national economy the plaintiff could perform (R. 66).

The ALJ then asked the Vocational Expert ("VE") the hypothetical at issue in this matter – if there would be any full-time, unskilled jobs available in the national economy for a hypothetical individual of Plaintiff's age and education and work experience, who could do light or sedentary work, but would be markedly limited with respect to dealing with co-workers, dealing with the public, dealing with work stresses, and demonstrating reliability, markedly being defined as having a serious limitation in this area so that the ability to function was severely limited, but not precluded. These limitations were from Mr. Atkinson's evaluation. In response to this hypothetical the VE testified:

> I'm going to say no with the understanding that work stress means that the individual would have to maintain a regular schedule which some people find stressful; getting up the same day - - same time everyday and going through an eight hour day and I base that on the combination reliability and work stress.

(R. 67-68).

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (a), ALJ Moon made the following findings:

1. The claimant has not engaged in substantial gainful activity since December 14, 2006, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; obesity; major depression; and anxiety (20 CFR 416.921 et seq.).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the

claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967 (b) with no more than occasional postural movements; no exposure to workplace hazards such as unprotected heights or dangerous moving machinery; no high production rate expectations; no sales quotas; and no more than occasional contact with co-workers, supervisors or the general public.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on April 4, 1980 and was 26 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since December 14, 2006, the date the application was filed (20 CFR 416.920(g)).

(R. 15-26).

## IV. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less

than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984)(quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.    The Administrative Law Judge erred in finding that the limitations set forth by Mr. Atkinson are not supported and that even if they were they would not preclude all work, as the VE testified that they would preclude work.

2.    The substantial evidence of record does not support a finding that the claimant can perform sustained work activities.

3.    While the ALJ acknowledged the evidence of record from Northwood Health Systems, he failed to evaluate or explain the weight accorded the evidence.

Defendant contends:

1.    The ALJ properly evaluated Mr. Atkinson's opinion as unsupported.

2.    The ALJ sufficiently considered evidence from Northwood.

3.    Substantial evidence supports the ALJ's finding that Plaintiff retained the RFC to perform a limited range of light work.

## C. Mr. Atkinson's Opinion

Plaintiff first contends the Administrative Law Judge erred in finding that the limitations set forth by Mr. Atkinson are not supported and that even if they were they would not preclude all work, as the VE testified that they would preclude work. Defendant contends the ALJ properly evaluated Mr. Atkinson's opinion as unsupported.

The ALJ first found that Mr. Atkinson's opinion that Plaintiff would be markedly impaired in her ability to deal with co-workers and the public; with work stresses; and demonstrating reliability were inconsistent with Plaintiff's activities of daily living as well as findings from other evaluators and treating sources. Plaintiff argues that the ALJ erred in not further evaluating or discussing Mr. Atkinson's opinion, and that it is "impossible for future reviewers . . . to determine how much weight was given to Mr. Atkinson's evaluation or opinion."

20 C.F.R. § 404.1527 states:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and

severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

It is first important to note that, as the ALJ found, Mr. Atkinson is a consulting psychologist who saw Plaintiff on only one occasion, and that was to evaluate her for disability. He is therefore

not entitled to the weight accorded a treating physician or even a physician who examined a claimant only once, but in order to diagnose her for treatment purposes. The ALJ found that Mr. Atkinson's findings of marked limitations were inconsistent with the record, including Plaintiff's own activities of daily living reports as well as findings from other evaluators and treating sources. Mr. Atkinson evaluated Plaintiff on September 10, 2008, finding she had these marked limitations. He also diagnosed her with schizoid-obsessive personality disorder, and is the only provider in the entire record to do so. Notably, according to the DSM-IV, this disorder "is uncommon in clinical settings." Mr. Atkinson used the DSM-IV code 301.20, which is the code number for schizoid personality disorder only. One of the characteristics of Schizoid Personality Disorder is a seeming indifference to the approval or criticism of others. They do not seem to be bothered by what others may think of them. This is in contrast to Plaintiff's statement to the Social Security employee that: "I could not do the job and I felt like everyone was watching me and I could not handle that feeling so I walked out," and : "I can't be around people, I get too upset too easy. I feel like everyone looks at me like I am stupid and I can't handle the jobs."

Further, according to the DSM-IV, individuals with Obsessive-Compulsive Personality Disorder "may also show an apparent social detachment "stemming from devotion to work and discomfort with emotions," while the record indicates Plaintiff has worked extremely little, and stated openly numerous times that she cried or acted out angrily. (Emphasis added). Further, obsessions are defined as "persistent ideas, thoughts, impulses, or images that are experienced as intrusive and inappropriate and that cause marked anxiety and distress . . . . The thoughts, impulses, or images are not simply excessive worries about real life problems (e.g., concerns about current ongoing difficulties in life, such as financial, work, or school problems), and are unlikely to be

related to a real-life problem." There is no other mention in the record of Plaintiff having persistent ideas unrelated to real-life problems. In fact, her treating providers generally opined that Plaintiff's anxiety was due to her marital problems, financial problems, and child-care problems (all real-life, serious difficulties). The undersigned finds no support in the record for Mr. Atkinson's diagnosis of schizoid-obsessive personality disorder.

More significantly, no treating provider around the time of Mr. Atkinson's evaluation found nearly such marked impairments. In July 2008, two months before her evaluation by Mr. Atkinson, Plaintiff reported "significant improvement" with her new medication. Three weeks later, she reported having no difficulties; sleeping well; having normal mood and energy; feeling better with less frequent mood swings, less irritability, and less anxiety; and having improved motivation and sleep.

On August 18, 2008, just one month before her appointment with Mr. Atkinson, Plaintiff still reported having no difficulties. She was sleeping well. Her energy was normal and her mood was normal. She had no medical problems. She had less frequent mood swings, less irritability and anxiety, and more energy and motivation. She was sleeping better. She had no suicidal or homicidal ideations and was in "good spirits."

Yet only a month later, she reported to Mr. Atkinson that she felt depressed most of the time, several times a week, even with medications. She reported anxiety, feeling "like a heart attack" about once a month, for about 15 or 20 minutes. She reported irritability, "punch walls, being this way makes me mad, irritable with the kids," about once a week.

Yet, on September 15, 2008, only five days after her evaluation by Mr. Atkinson, Plaintiff again denied depression or anxiety to her treating provider, and stated that the medication helped (R.

383). She was having no problems with her medications. Her attitude was pleasant, her affect normal, and she was well-groomed. This office note was signed by a doctor.

The undersigned finds substantial evidence supports the ALJ's determination that Mr. Atkinson's opinion regarding Plaintiff's limitations is inconsistent with the record as a whole and with the opinions of other providers, including treating providers.

Additionally, Mr. Atkinson does not present relevant evidence, particularly medical signs and laboratory findings, to support his opinion. The undersigned is aware that there are fewer tests and laboratory procedures for mental impairments than for physical; however, Mr. Atkinson performed only a clinical interview and a mental status examination. There is no testing, in particular personality testing, mentioned in his report. In fact, his opinion appears to be based almost entirely on Plaintiff's subjective reports of her own symptoms. As already noted, these reports of symptoms were entirely different than her reports to her treating providers around the same time. Besides her immediate symptoms, Plaintiff's reports regarding her history are also inconsistent. She told Mr. Atkinson she had not used marijuana since age 19, while Northwood noted she reported using "a joint" of marijuana the morning of her admission. Plaintiff originally said she quit college because she hated it, but told Mr. Atkinson she did not get up for classes due to depression.

Significantly, where instructed to "[i]dentify that factors that support[ed his] assessment," Mr. Atkinson provided nothing whatsoever. He was specifically instructed that "the usefulness of [his] assessment depend[ed] on the extent to which [he did] this."

The undersigned therefore finds little support in Mr. Atkinson's own report for his opinion regarding Plaintiff's limitations.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial

evidence supports according no weight to Mr. Atkinson's opinion, in particular, his opinion that Plaintiff would have "marked" limitations of function.

Plaintiff next notes the ALJ's statement: "Nonetheless, even marked limitation in these areas would not preclude all work." Plaintiff argues that the VE testified that if the claimant were markedly limited in demonstrating reliability, dealing with co-workers and the public, dealing with work stresses and demonstrating reliability, there would be no jobs.

Because the undersigned has already found that substantial evidence supports a finding that Mr. Atkinson's opinion of marked limitations is not entitled to any weight, the issue of whether those limitations would preclude all work is moot. Nevertheless, the undersigned also notes that the VE's statement regarding the marked limitations was open to interpretation, as he stated there would be no jobs if "work stress means that the individual would have to maintain a regular schedule which some people find stressful; getting up the same day - - same time everyday and going through an eight hour day . . . ." There is no evidence in the record, however, that Plaintiff could not simply get up the same time everyday and go through an eight-hour workday. Also, as the ALJ noted, Plaintiff cared for three young children on her own, two of whom were young twins she described as "big handfuls." She also had quit jobs in the past due to "childcare issues," not because of the actual work.

### D. Combination of Impairments

Plaintiff next argues that the substantial evidence of record does not support a finding that she can perform sustained work activities. Plaintiff argues that when her physical and mental impairments are considered in combination her ability to complete basic work-related activities is severely limited. Plaintiff cites State agency reviewing physician Osborne, who limited Plaintiff to light work with occasional posturals, along with Mr. Atkinson's RFC showing she had marked

impairment in her abilities to relate to coworkers, deal with the public, deal with work stresses, and demonstrate reliability; and moderate limitation in the abilities to behave in an emotionally stable manner, relate predictably in a social manner, use judgment, interact with supervisors, function independently, and maintain concentration.

Plaintiff cited SSR 85-15, which provides:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

The undersigned has already found, however, that substantial evidence supports according no weight to Mr. Atkinson's opinion that she had marked limitations of function.

The ALJ did consider the State agency psychologist's opinion, which stated that Plaintiff's mental impairments resulted in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and one or two repeated episodes of decompensation. The consultant also completed a mental residual functional capacity assessment and opined Plaintiff would be no more than moderately limited in her ability to do work-related mental activities.

Ms. Mansuetto, M.A., also an examining psychologist, found the plaintiff independent in all activities of daily living. She took care of her children and her home and was able to manage her own finances. Plaintiff had had no inpatient therapy and was not being treated by a mental health provider at the time of her alleged onset date. She was treated only with medications, and those were

prescribed by her primary care physician. Upon Mental Status Examination, Plaintiff was cooperative and polite and her speech was relevant and coherent. Regarding Social Functioning, Ms. Mansuetto opined that during the examination Plaintiff was within normal limits with good eye contact and appropriate social skills. Although she was mild mannered and anxious she was socially appropriate.

Based on the record, State Agency psychologist Philip E. Comer, Ph.D., prepared a Mental Residual Functional Capacity Assessment ("MRFC") and Psychiatric Review Technique ("PRT") finding Plaintiff would be "moderately limited" in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to get along with coworkers or peers without distracting therm or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; and ability to travel in unfamiliar places or use public transportation (R. 244-246). She was not markedly limited in any area, and would not be significantly limited in any other functional area.

Under "Functional Capacity Assessment," Dr. Comer concluded Plaintiff's functional limitations did not exceed moderate and did not call for an RFC allowance. He opined she appeared to have the mental and emotional capacity for work-related activity in a low stress/demand work environment that had minimal interpersonal/social/travel requirements (R. 246).

20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The ALJ therefore properly and, in fact, necessarily considered the State agency psychologist's opinion regarding Plaintiff's limitations.

Despite the social limitations in his RFC, even Mr. Atkinson specifically stated under the heading SOCIAL FUNCTIONING that Plaintiff's social functioning was only "mildly deficient" during the interview based on observation of social interaction. This despite his being a total stranger in what would seem to be an anxiety-producing situation.

Regarding Plaintiff's treating providers, in July 2008, only seven months after her alleged onset date, Plaintiff reported "significant improvement" with her new medication. Three weeks later, she reported having no difficulties; sleeping well; having normal mood and energy; feeling better with less frequent mood swings, less irritability, and less anxiety; and having improved motivation and sleep.

On August 18, 2008, Plaintiff again reported having no difficulties. She was sleeping well. Her energy was normal and her mood was normal. She had no medical problems. She had less frequent mood swings, less irritability and anxiety, and more energy and motivation. She was sleeping better. She had no suicidal or homicidal ideations and was in "good spirits."

On September 15, 2008, one week before the Administrative Hearing, Plaintiff denied

depression or anxiety, and stated that the medication helped (R. 383). She was having no problems with her medications. Her attitude was pleasant, her affect normal, and she was well-groomed. She was instructed to continue her medications as prescribed. This office note was signed by a doctor.

Based on all of the above, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff could perform work at the light exertional level with no more than occasional postural movements; no exposure to workplace hazards such as unprotected heights or dangerous moving machinery; no high production rate expectations; no sales quotas; and no more than occasional contact with co-workers, supervisors or the general public.

The ALJ asked the VE a hypothetical containing the above limitations, and the VE responded that there would be a significant number of jobs the hypothetical individual with those limitations could perform. In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir. 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. The ALJ was not required to include the marked limitations cited by Plaintiff because, as already found, they are not supported by substantial evidence in the record.

The undersigned therefore finds substantial evidence supports the ALJ's determination that there were a significant number of jobs in the national economy that Plaintiff could perform.

### E. Northwood

Plaintiff next argues that while the ALJ acknowledged the evidence of record from Northwood Health Systems, he failed to evaluate or explain the weight accorded the evidence. Defendant contends the ALJ sufficiently evaluated the evidence from Northwood.

Plaintiff notes the mental status evaluation from her treating psychiatrist shows how severe

her mental impairments are (R. 276), and that she had been treating with Northwood since early 2008, when she was admitted to the crisis unit for suicidal thoughts (R. 276). The Northwood records show she was having suicidal thoughts and was viewed as a threat to herself. She entered the inpatient program with a GAF of 20, but reported feeling better within a "couple of days" and then discharged herself, albeit against advice.

Plaintiff argues the ALJ did not acknowledge or reference the weight given the Northwood Health Systems treatment notes, nor to the diagnosis of major depressive disorder, severe, without psychotic features.

A review of the ALJ's decision shows he did note that Plaintiff was seen at Northwood, but also found significant that at the hearing on September 22, 2008, she also admitted that she had not seen a therapist for some period of time. Northwood (where Plaintiff went for medication management) also noted she had not presented for therapy in a long time. When she did report for visits with Northwood providers she was generally found to report no problems or no more than moderate problems. Further, the ALJ did find Plaintiff had a severe impairment of Major Depression, as had Northwood.

Plaintiff's alleged onset date is December 1, 2006. Plaintiff was admitted to the crisis unit of Northwood Health Systems on February 21, 2008, more than a year later, reporting acute levels of depression, anxiety, blunted affect, worthlessness, hopelessness, helplessness, change in appetite, and poor judgment with severe levels of suicidal ideations. She stated she felt isolated and was crying all of the time. There were relationship problems with her ex-husband over money and she stated she had "no income." She was fighting with her ex-husband but refused to give further detail about the situation (R. 280-81). She was currently taking Prozac and Buspar (R. 309). It was also noted that Plaintiff reported having smoked one joint of marijuana that morning. The admission

diagnosis was Major Depression, Recurrent, Severe, without Psychosis. No physical problems were noted, and Plaintiff reported not having chronic physical problems or being bothered by any physical problems. Although she stated she had no substance abuse problem it was twice noted she reported upon admission she had been smoking marijuana that morning, but later would not answer questions on this issue. Plaintiff reported her "usual employment pattern in the last 3 years was "unemployed," her longest full-time job in number of years as "0", and listed her Employment Status as "Homemaker."

On her functional self-assessment at Northwood, Plaintiff reported having "no" problems with activities of daily living, except for needing merely guidance in handling her personal finance, and accessing and using available transportation. The "staff" mostly agreed, finding Plaintiff had only a mild impairment in activities of community living. Plaintiff also self-reported being generally able to ask for help when needed, form and maintain a social network, engage in social/family activities, effectively manage child care responsibilities and/or other family or interpersonal obligations, effectively handle conflict with others, and assert herself effectively and appropriately. The undersigned notes the "staff" disagreed and opined Plaintiff had marked impairments in these areas. She was diagnosed with Major Depression, Recurrent, Severe, without Psychosis, and given a GAF of 20, meaning severe impairments. Notably, this was a "provisional diagnosis," with a need stated for a comprehensive psychiatric evaluation to determine the appropriate diagnosis. The evaluation was not signed by a psychologist, psychiatrist or doctor.

Four days after her admission Plaintiff reported "feeling better" and her mood was good with no anxiety or mood swings. Her mood was euthymic, her affect appropriate, and she had normal eye contact and speech. Her concentration, depression, and judgment were improved and she denied feelings of worthlessness, hopelessness, and crying. She was sleeping well at night and felt the

BuSpar had helped. She had no suicidal ideations. In fact, her mental status examination was all normal. She missed her children and was ready to go home (R. 298, 300). She herself noted improvements "a couple days after getting here."

By April, Northwood, in a Psychiatric Evaluation, noted Prozac was helping Plaintiff' depression although she still reported being mildly depressed, and BuSpar was controlling anxiety, to a point where it was only mild to moderate. She had no problems with focus or concentration but reported lacking energy and motivation. She denied suicidal thoughts.

On April 25, 2008, Plaintiff told her clinician that her twin girls were "big handfuls" and that they kept her busy. Instead of dealing with her problems she ignored them by keeping herself busy. She also reported by overwhelmed by child care issues.

On May 9, 2008, Plaintiff reported she was sleeping well, but felt anxious.

On May 30, 2008, Plaintiff was noted to be "in good spirits" (R. 360).

On June 27, 2008, Plaintiff reported sleeping well, and stated she had not had much trouble with her relationships. She was instructed to start Depakote.

In July 2008, Plaintiff reported "significant improvement" with her new medication. That same month she reported having no difficulties; sleeping well; having normal mood and energy; feeling better with less frequent mood swings, less irritability, and less anxiety; and having improved motivation and sleep.

On August 18, 2008. Plaintiff again reported having no difficulties. She was sleeping well. Her energy was normal and her mood was normal. She had no medical problems. She had less frequent mood swings, less irritability and anxiety, and more energy and motivation. She was sleeping better. She had no suicidal or homicidal ideations and was in "good spirits."

On September 15, 2008, Plaintiff denied depression or anxiety, and stated that the medication

helped (R. 383). She was having no problems with her medications. Her attitude was pleasant, her affect normal, and she was well-groomed. She was instructed to continue her medications as prescribed. This office note was signed by a doctor, and is the last prior to the hearing.

The undersigned finds the ALJ did properly discuss Plaintiff's treatment with Northwood. He used their diagnosis, noted that by the time of the hearing, only seven months later, that she had not seen a therapist for some period of time, and noted that during the sessions she did attend she generally reported no problems or no more than moderate problems. This discussion, though brief, is entirely consistent with the record. Although the ALJ did not expressly state the weight he gave those records, which is an error under the Regulations, the undersigned finds that error harmless, because, after her one admission in February, the Northwood reports show Plaintiff improved quickly and dramatically, to the point where, less than six months later, she denied any depression and anxiety, reporting she had "no problems." See Morgan v. Barnhart, 106 Soc. Sec. Rep. Serv. 456 (4th Cir. 2005), in which the Fourth Circuit found that an error committed by the ALJ was harmless, relying on Ngarurih v. Ashcroft, 371 F.3d 182 (4th Cir. 2004)("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which the action can be sustained, reversal is not required where the alleged error clearly had not bearing on the procedure used or the substance of the decision reached.")

The undersigned finds the ALJ's omission of the weight accorded the Northwood reports and the brevity of his discussion of those reports had no bearing on the procedure used or the substance of the decision he reached, and is therefore harmless.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's determination that Plaintiff was not disabled, as defined in the Social

Security Act, since December 14, 2006, the date the application was filed.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's application for SSI. I accordingly respectfully recommend Defendant's Motion for Summary Judgment [Docket Entry 10] be **GRANTED,** Plaintiff's Motion for Judgment on the Pleadings [Docket Entry 9] be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _13_ day of December, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE