**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**AMANDA LYNN LIVELY,**

          **Plaintiff,**

**v.**                              **CIVIL ACTION NO. 1:09CV144**
                                    **(Judge Keeley)**

**COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,**

          **Defendant.**

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

     Pursuant to 28 U.S.C. §636(b)(1)(B), Fed.R.Civ.P. 72(b) and
Local Court Rule 4.01(d), on October 26, 2009, the Court referred
this Social Security action to United States Magistrate John S.
Kaull with directions to submit proposed findings of fact and a
recommendation for disposition.

     On December 13, 2010, Magistrate Judge Kaull filed his Report
and Recommendation ("R&R") and directed the parties, in accordance
with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 6(e), to file written
objections within fourteen (14) days after being served with a copy
of the R&R. On December 26, 2010, plaintiff, Amanda Lynn Lively
("Lively"), through her attorneys, Craig R. Lavender and Jan Dils,
filed timely objections to the R&R. On January 6, 2011, the
Commissioner responded to these objections. The matter is now ripe
for review.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

## I.  PROCEDURAL BACKGROUND

On December 14, 2006, Lively filed an application for supplemental security income ("SSI"), alleging disability since December 1, 2006. The Commissioner denied the application initially on April 5, 2007, and on reconsideration on October 25, 2007. Following a request for a hearing, an Administrative Law Judge ("ALJ") conducted a hearing on September 22, 2008, at which Lively, represented by counsel and a vocational expert ("VE"), testified. On April 6, 2009, the ALJ determined that Lively was not disabled because, after considering her age, education, work experience and residual functional capacity, he concluded that she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  On August 27, 2009, the Appeals Council denied Lively's request for review, and the ALJ's decision became the final decision of the Commissioner. On October 26, 2009, Lively filed this action seeking judicial review of the final decision.

## II.  PLAINTIFF'S BACKGROUND

On December 1, 2006, the alleged onset date, Lively was 26 years old, and was 29 years old on April 6, 2009, the date of the ALJ's decision. Pursuant to 20 C.F.R. § 416.963, she is considered

a younger person. Lively has a high school education and attended West Liberty State College for two months. Her employment history includes employment as a dishwasher at Bob Evans in December 2006 for two days, as a cashier at Dollar General for four months in 2001, and as a Deli Clerk in a grocery store in 2005.

## III.    ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.  Lively has not engaged in substantial gainful activity since December 14, 2006, the application date;

2.  Lively's severe impairments, degenerative disc disease of the lumbar spine, obesity, major depression and anxiety, do not, alone or in combination, meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

3.  Lively has the residual functional capacity to perform light work with no more than occasional postural movements, no exposure to workplace hazards such as unprotected heights or dangerous moving machinery, no high production rate expectations, no sales quotas, and no more than occasional contact with co-workers, supervisors or the general public;

4.  Lively is unable to perform any of her past relevant work (20 CFR § 404.1565);

3

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

5.   Lively is considered a younger individual age 18-49
     (20 CFR § 416.963);

6.   Lively has at least a high school education and is
     able to communicate in English (20 CFR § 416.964);

7.   Transferability of job skills is not material to
     the determination of disability because the
     Medical-Vocational Rules used as a framework
     support a finding of "not disabled," whether or not
     Lively has transferable job skills (20 CFR § 404,
     Subpart P, Appendix 2);

8.   Considering Lively's age, education, work
     experience and residual functional capacity, there
     are jobs in significant numbers in the national
     economy that she can perform; and

9.   Lively has not been under a disability, as defined
     in the Social Security Act, since December 14,
     2006, the date on which she filed her application
     (20 CFR 426.920(g)).

## IV.  <u>PLAINTIFF'S OBJECTIONS</u>

In her objections to the R&R, Lively contends that 1) the ALJ

erred in determining that the opinion of John Atkinson, M.A., a

psychologist, who submitted a consultative mental status

examination report, is inconsistent with the record as a whole and

is not supported by substantial evidence, and 2) the Magistrate

Judge's reliance on Mr. Atkinson's diagnoses of Schizoid

Personality Disorder and Obsessive-Compulsive Personality Disorder,

rather than his diagnosis of Major Depressive Disorder, is

misplaced because the diagnosis of Major Depressive Disorder and its associated limitations is consistent with the record. The Commissioner contends that Lively's objections are essentially the same issues she raised in her initial brief.

## V.  <u>MEDICAL EVIDENCE</u>

The medical evidence of record in this case includes:

1.   An April 13, 2003, emergency department record from Sistersville General Hospital indicating that Lively was experiencing a sensation of passing out, and noting that she was six (6) months pregnant and feeling dizzy and nauseous. She was treated and discharged in improved condition on the same date;

2.   A June 25, 2004, emergency department record regarding Lively from Sistersville General Hospital indicating her chief complaint was a sore throat, and  a diagnosis of Pharyngitis. Lively was directed to use Chlorseptic for temporary relief and given a prescription for an antibiotic;

3.   An August 12, 2004, emergency department record regarding Lively from Sistersville General Hospital indicating that she complained of lower back pain and breakthrough bleeding after a Depo-Provera (contraceptive) shot and a diagnosis of PID - Pelvic

Inflammatory Disease. She was given a prescription for Vicodin and Vibramagian (illegible in transcript);

4. A September 16, 2004 emergency department record from Sistersville General Hospital indicating Lively fell down the stairs at her home and experienced ankle swelling. An x-ray of her right ankle revealed soft tissue swelling adjacent to the lateral malleolous but no fracture, dislocation or other abnormality. The doctor diagnosed a sprained right ankle, applied an air splint, gave her three Vicodin tablets, and discharged her;

5. A November 28, 2004 emergency department record from Sistersville General Hospital indicating Lively complained of an infected tooth in the lower jaw. She was given Vicodin and Amoxicillin and instructed to follow-up with a dentist;

6. A December 29, 2004 emergency department record from Sistersville General Hospital indicating Lively complained of back pain that began after she had an epidural 18 months earlier during childbirth. She was treated with Nubain, Phenergin and Robaxin and released;

7. An April 15, 2005 emergency department record from Sistersville General Hospital indicating Lively complained of tooth pain in the left bottom molar. She was treated with Amoxicillin,

Nubain and Phenergen and instructed to go to the dental clinic at Ruby Memorial;

8.    A December 12, 2005 emergency department record signed by Billy Martin, D.O., Sistersville General Hospital, indicating that Lively complained of low back pain. He  diagnosed a contusion of the lower back and treated Lively with Flexeril and two tablets of Vicodin;

9.    A March 5, 2006 emergency department record from Sistersville General Hospital indicating Lively complained of back pain due to lifting while moving. She was diagnosed with back pain/strain, given prescriptions with no refills for thirty (30) Flexeral  and fifteen (15) Vicodin and told to return if symptoms did not improve or worsened;

10.    A September 25, 2006 emergency department record from Sistersville General Hospital indicating Lively complained of dental pain. She was given prescriptions for thirty (30) Amoxicillin and 25 Vicodin with no refills and told to follow up with a dentist;

11.    An October 9, 2006 emergency department record from Sistersville General Hospital indicting Lively complained of having experienced back pain since delivering her child (3) three years

7

ago and recently lifting a child weighing approximately 100 pounds. She was treated with Toradol. An x-ray of her lumbar spine revealed five views without displaced fracture, subluxation, or significant disc narrowing, slight multi-level end-plate lipping, with mild S1 sclerosis, and was negative for fracture;

12.   An October 23, 2006 office note from Dr. S. Chandra S. Sekhar indicating that Lively had complained of low back pain for three years, and had left foot pain/knot and shooting pain in her right leg. The assessment was L/S sprain. She received prescriptions for Vicodin and Soma;

13.   A November 22, 2006 office note from Dr. Sekhar indicating that Lively complained of low back pain. Lively also reported that she had started working at a Bob Evans Restaurant.[1] She was directed to continue physical therapy[2];

14.   A January 1, 2007, SSA Function Report completed by Lively indicating:

> I've dealt with this problem for many years
> but it has gotten worse.  I was on nerve
> medicine when I was three years old and I
> tried to overdose when I was 17.  I've been to

---

[1] Lively later reported working at the Bob Evans for only two days and "walking out" due to a panic attack.

[2] The record does not contain any physical therapy reports.

> counselors and therapists and I've been on
> many different medicines.  I am now separated
> from my husband and am a single mom with 3
> kids.  I tried to work because I knew I had to
> but I couldn't do it.  I had a panic attack
> and I left knowing I had no other income.  I
> truly feel I cannot work at this time.  I get
> physically ill just thinking about being
> around people.

Lively also reported that she was in a constant state of worry.  She listed her daily activities as waking up at 6:45 A.M. to get her older girls ready for school, going back to bed until her youngest daughter awakened, sitting on the couch to watch television, helping her girls with homework, putting them in bed around 8:00 P.M., preparing daily meals of sandwiches and french fries, cleaning house and generally taking care of her three young children;

15.  A January 9, 2007 X-ray report of Lively's right and left feet from Wetzel County Hospital indicated asymmetrical bilateral exostoses of the medial aspect of the tarsal bones. It also indicated that there was an OS tibiale externum accessory bone bilaterally larger on the right side than on the left. The bones of the foot were otherwise unremarkable. Joint spaces were well maintained and there was normal alignment. The impression indicated that the asymmetric bilateral OS tibiale externum accessory bones

related to the tarsal navicular bones bilaterally is considered a normal variant;

16.  A January 22, 2007 office note from Dr. Sekhar indicating Lively complained of lower back pain. Dr. Sekhar directed her to continue physical therapy and referred her for an MRI;

17.  A March 22, 2007 office note from Dr. Sekhar indicating a follow-up examination of Lively for back pain and complaints of burning and radiating pain from her back into her legs.  Dr. Sekhar prescribed Vicodin and Norflex;

18.  A March 25, 2007 report from an MRI of Lively's lumbar spine indicating spinal canal stenosis at L2-L3 through L4-L5, largely relating to facet arthropathy, with shallow broad-based disc bulges at L3-L4 and L4-L5 contributing minimally to the spinal canal stenosis. The most significant finding was a broad-based disc protrusion at L5-S1, resulting in bilateral neural foraminal stenosis;

19.  A March 28, 2007 Mental Examination report from M. Aileen Mansuetto, M.A., prepared for the State Disability Determination Service ("DDS"), indicating Lively reported smoking two packs of cigarettes a day and consuming a six-pack of Mountain Dew a day. Lively  stated: "I tried to work this last time.  I had a panic

attack.  I'm not lazy and I can do the work, but being around people, I get nauseous."  She stated that her symptoms had worsened during the past year or so.

Ms. Mansuetto observed that Lively was a casually dressed, well groomed, 26 year old female, five feet six inches tall, weighing 220 pounds who is independent in all activities of daily living.  She cares for her children and her home, is able to manage her own finances, receives $500 a month in food stamps and $30 a month in a utility check, does not receive financial assistance from the State because she has used her allotted welfare money but does receive financial help from her mother.

Lively has not received inpatient therapy or treatment from a mental health provider. Her primary care physician previously has prescribed Wellbutrin and Lorazepam, and recently prescribed Prozac.

Mental Status Examination revealed Lively was cooperative and polite, had relevant and coherent speech, was fully oriented, had a sad mood, was depressed and anxious, had a flat affect, mildly deficient concentration, normal psychomotor activity, no evidence of delusions, obsessions, compulsions, hallucinations or illusions,

and adequate judgment. Lively did report suicidal/homicidal ideations.

Ms. Mansuetto determined Lively had normal immediate and remote memory, moderately deficient recent memory, normal persistence and pace, and was within normal limits in social functioning during the examination, with good eye contact and appropriate social skills. She stated that, although Lively was mild mannered and anxious, she was socially appropriate.

Ms. Mansuetto provided the following diagnostic rationale:

> The claimant does not leave her home for extended periods of time. This is caused by her fear of having a panic attack in public. She experiences shortness of breath, feeling emotionally overwhelmed, sweating and other physiological difficulties, thus, meets the diagnostic criteria for panic disorder with agoraphobia. The claimant also shows depressive symptomatology with poor concentration, excessive crying, down and despondent mood most days, poor libido, anhedonia, suicidal ideation, and excessive crying. This meets diagnostic criteria for major depressive disorder.
>
> The claimant is independent in all activities of daily living. She takes care of her children and her home.

Ms. Mansuetto's Diagnostic Impression was Panic Disorder with agoraphobia and Major Depressive Disorder, moderate, recurrent. She

reported that Lively's prognosis was guarded but that matters might improve if she participated in therapy;

20. An April 4, 2007 Mental Residual Functional Capacity Assessment ("MRFC") report from State Agency psychologist Philip E. Comer, Ph.D., indicating that Lively had moderate limitations in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, ability to work in coordination with or proximity to others without being distracted by them, ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact appropriately with the general public, ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, ability to respond appropriately to changes in the work setting, and ability to travel in unfamiliar places or use public transportation. She was not significantly limited in her ability to understand, remember and carry out very short and simple or detailed instructions, ability to maintain attention and concentration for extended periods of time, ability to sustain an ordinary routine without special supervision, ability to make

simple work-related decisions, ability to ask simple questions or request assistance, ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, ability to be aware of normal hazards and take appropriate precautions, and ability to set realistic goals or make plans independently of others. She was not markedly limited in any area, and, therefore, would not be significantly limited in any other functional area.

In his "Functional Capacity Assessment," Comer opined that "Claimant's functional limitations did not exceed moderate and did not call for an RFC allowance." He determined that Lively appeared to have the mental and emotional capacity for work-related activity in a low stress demand work environment that had minimal interpersonal, social and travel requirements;

21. An April 4, 2007 Psychiatric Review Technique ("PRT") from Dr. Comer indicating Lively had an affective disorder and an anxiety disorder with a mild limitation in activities of daily living, a moderate limitation in maintaining social functioning, a mild limitation in maintaining concentration, persistence, or pace, and had experienced one or two episodes of decompensation, each of extended duration. He concluded: "Claimant's diagnoses and

concomitant limitations do not meet or equal listings but do call for an RFC assessment.  Her statements are reasonably consistent with CE and are credible from her perspective;"

22.  An April 10, 2007 office note from Dr. Sekhar indicating that Lively had an appointment to review the March 25, 2007 MRI report and the assessment of spinal stenosis. Dr. Sekhar referred Lively to a neurologist;

23.  A May 17, 2007 office note from Dr. Sekhar indicating that Lively needed a prescription for Vicodin and that her EMG was rescheduled to June;

24.  A June 22, 2007 EMG report from John G. Tellers, M.D., Reynolds Memorial Hospital, indicating:

> This is a 27-year-old right handed female, with no allergies, on Prozac 40 mg qd and Vicodin-ES 7.5 mg, with complaints of low back pain, ongoing for about three years with pain radiating into the right buttock and down the right lateral leg, generally not below the knee.  She has some sense of occasional right leg tingling or numbness.  There is no history of diabetes.  She has been a one pack per day cigarette smoker for ten years.

Impression:

1.  Normal right peroneal and tibial mixed nerve conduction study - no evidence of neuropathy.

2.  Query right L4 Radiculopathy, chronic;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

25. A June 26, 2007 neurosurgical evaluation report from Dr. Charles Rosen, M.D., University Health Associates, indicating Lively reported low back pain that she cannot associate to any specific injury that she believed started approximately three years earlier after the delivery of her second child. She stopped going to physical therapy because she did not believe she was receiving any benefit from the treatment. Her current medications included Prozac and Vicodin. Dr. Rosen stated that the MRI showed mild degenerative changes but no evidence of root compression. He did not recommend neurosurgical intervention at this time and recommended "structured physical therapy that uses active modalities only," weight loss, and smoking cessation. He advised Lively to use over-the-counter anti-inflammatories and, because of tolerance issues, to limit her narcotic intake;

26. A July 18, 2007 office note from Dr. Sekhar indicating that Lively complained of anxiety attacks and low back pain. The note indicated that Lively saw the neurosurgeon on June 26, 2007 and that no surgery was recommended;

27. A July 20, 2007, Function Report completed by Lively for SSA stating:

> I do not feel that I can work at this time.
> I get nervous and have panic attacks and I
> feel like I am having a heart attack. I have
> three kids to take care of and I don't know
> how I am going to do it. I need help. It is
> in my medical records that I have been dealing
> with this all my life and I am lost. I don't
> know what I am supposed to do.

28. An undated Disability Report - Appeal form completed by Lively, indicating a change in her condition since the January 1, 2007, function report regarding the diagnosis on April 10, 2007 of a herniated disc and two bulging discs in her back. She reports she is unable to stand for long periods of time or lift heavy objects; that she had begun taking medicine for her nerves when she was (5) five years old, and, since then, has taken medication for her nerves; that in 1998, she ingested a number of pills from her mother's medicine cabinet and doctors at Sisterville General Hospital had to pump her stomach; and that doctors at Sistersville General Hospital have treated her for lower back pain. She listed her medications as Depo-Provera (contraceptive), Norflex, Prozac and Vicodin;

29. An August 23, 2007 office note from Dr. Sekhar indicating she had prescribed Depo Provera for Lively;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

30.  A September 18, 2007 office note from Dr. Sekhar indicating that Lively wanted to change her medications from Lexapro back to Prozac because the Lexapro made her feel irritable and edgy;

31.  A September 25, 2007 evaluation of Lively's orthopedic status from Thomas J. Schmitt, M.D., which, in the history of present illness section, indicated:

> The patient has a four year history of lumbar pain radiating to the left lower extremity in sciatic distribution. She complains of arthralgias of the ankles. She rates her pain on a scale of 10/10+ at the worst and 5/10 at the best. She further alleges disturbed sleep pattern secondary to the pain. Left leg buckles several times a week on ambulation. There is no history of deformities nor has there been any heat, redness, swelling, enlargement, effusion, morning stiffness, or tenderness in any joint. The patient further alleges that bending, stooping, sitting or standing for prolonged periods aggravate the low back pain. The patient has had no precise history of injury but has had a history of heavy yard work in her younger years to the present date. No surgery has been performed.

He noted her current medications were Vicodin and Prozac, her gait and speech were normal, her past medical history was positive for panic disorder, anxiety, back pain, L5/S1 bulging disc with

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

stenosis, L2/3 through L4/5 canal stenosis with facet arthropathy, and L3/4 and L4/5 disc bulge.

Physical examination revealed an alert, oriented, well developed, well nourished white, 27 year old female in no apparent distress, 120/80 blood pressure, pulse 80, height 65 ½ inches, weight 200 pounds, no pallor, cyanosis, jaundice or flushing, no kyphosis or scoliosis of the back, no cyanosis of the upper extremities, no clubbing of nailbeds or palmar erythema, no venous varicosities or statsis dermatitis of the lower extremities, fully palpable peripheral pulses in upper and lower extremities, and no femoral bruits.

Dr. Schmitt observed that Lively had only mild difficulty getting on and off the examining table, had moderate difficulty walking heel to toe, squatting, and hopping, had normal gait, had positive straight leg raise at 40 degrees on the right and 50 degrees on the left in both sitting and supine positions, and had full range of motion in all joints with the exception of the lumbar spine where flexion was limited. He noted:

> The patient has a history of back problems
> from an early age. She has had no surgery.
> MRI dated 3/25/07, has demonstrated severe
> degenerative disc disease at all levels of the
> lumbar spine as well as canal stenosis of L4/5

> and disc protrusion at L5/S1. The patient's
> range of motion is severely limited in
> activities of daily living.

His impression was a severely limited range of motion of lumbar spine, a herniated disc at L4/5, severe degenerative disc disease at all levels of the lumbar spine with right neural foraminal stenosis L5/S1, and severe limitation in ambulatory activities for daily living;

32. An October 19, 2007 Physical Residual Functional Capacity Assessment from Cindy Osborne, D.O., a state agency reviewing physician, indicated Lively could lift 20 pounds occasionally and 10 pounds frequently, could stand or walk about 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday, had unlimited ability to push and pull (including operation of hand and foot controls) other than as shown for lifting and carrying, could occasionally climb ladders, ropes or scaffolds and perform all other postural movements, and should avoid concentrated exposure to cold, vibration and hazards.

In the symptoms section of the form, Dr. Osborne noted:

> Lives with family. Cares for her 3 kids.
> States she does not feel like doing personal
> care. People remind her to brush her teeth &
> to bathe. Neighbor cooks for her. She
> straightens up her apartment. Can drive but

> has no car. Grocery shops once a month. States
> she is able to count change & that she has no
> money to pay bills. States trouble: lifting,
> bending, and getting along with others. Does
> not handle stress or changes in routine well.
>
> Complaints are mostly credible and support
> decrease in RFC to light with limitations as
> indicated;

33.  A November 19, 2007 office note from Dr. Sekhar indicating Lively was given prescription refills for Depo, Vicodin ES, Norflex and Prozac;

34.  A February 19, 2008 office note from Dr. Sekhar indicating that Lively had received a Depo Provera injection. An notation at the bottom of this office note indicated a call from Karen Lively on April 24, 2008, reporting that "Amanda is selling Vicodin;"

35.  A February 21, 2008 Medical Necessity Assessment from the crisis unit of Northwood Health Systems ("NHS") indicating admission due to

> increased symptoms including acute crisis
> levels of: depression, anxiety, blunted
> affect, worthlessness, hopelessness,
> helplessness, change in appetite, and poor
> judgement [sic], severe levels of: suicidal
> ideations with a plan to overdose, poor
> concentration, crying, low energy, change in
> sleep patterns, loss of interest in
> activities, and moderate levels of: hostility,

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> impulsitivity, and agitation.  Amanda reports
> she has had thoughts of suicide for the last
> couple of weeks, no homicidal ideation, no
> hallucinations.  Amanda reports her depression
> and anxiety are elevated at this time. Amanda
> states that she is isolated and crying all the
> time. She reports relationship problems with
> ex husband over money issues. States I have no
> income 'also reports she is tired all the
> time. Amanda reports no drug abuse but notes
> she states has used marijuana upon admission.
> Amanda states she has been physically and
> sexually abused but will not comment at this
> time.

The report notes that her estimated length of stay would be seven

to ten days, current medications as Prozac and Buspar, and a report

of smoking one joint of marijuana that morning. It also indicated

that Lively had previously been admitted to NHS in March 2001 for

treatment for depression and counseling at Wellsprings. The

diagnosis on admission was Major Depression, Recurrent, Severe,

without Psychosis.  No physical problems were noted;

36.  A February 25, 2008, progress note from NHS indicting

Lively reported "feeling better" and her mood was euthymic with no

anxiety or mood swings, her affect appropriate, her eye contact and

speech were normal, her concentration, depression, and judgment

were improved and she denied  feelings of  worthlessness,

hopelessness, and crying.  She was sleeping well at night and felt

the Buspar had helped. She  missed her children and was ready to go home;

37.  A February 26, 2008, progress note from NHS indicating Lively reported "less anxiety", appreciated her family more and no problems with sleep;

38.  A February 27, 2008, progress note from NHS indicating Lively reported no suicidal thoughts, no feelings of depression, good concentration, and sleeping at least eight hours. Lively left NHS on February 27, 2009 against the advice of her counselor.

In contrast to Lively's statements, the NHS counselor's note dated  February 27, 2009 indicates that Lively continued to display problems with severe depression and anxiety, moderate social withdrawal, impulsivity, poor judgment, a blunted affect, agitation, low energy, poor appetite and sleeping patterns, and lack of motivation. The consumer Staff Functional Assessment section of the progress note indicates Lively had a moderate limitation in self care, social, interpersonal and family  and concentration and task performance and mild limitation in activities of community living and dangerous and impulsive behavior;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

39. A March 7, 2008 progress note from Certified Nurse Practitioner Monica Smith, NHS, indicating complaints of feeling depressed and problems sleeping. Ms. Smith noted Lively was cooperative, her appearance was unremarkable, her activity level, affect and speech were normal and she was oriented to person, place and time. She did not feel that Lively was a danger to herself or others, and determined there was a need for psychotropic medications. She continued Prozac, Buspar and Trazadone and scheduled a follow-up appointment in two weeks;

40. A March 28, 2008 therapy note from Shirley Juare, MSCP, NHS, indicating Lively's mood was anxious due to anxiety over plans to file divorce papers and being unsure of her ex-husband's reaction and her progress was "slow but steady." Lively reported distracting herself by keeping busy with scheduled appointments and caring for her daughters. The therapy plan was to continue working with Lively to help her learn and implement strategies to more effectively manage her symptoms of anxiety;

41. An April 4, 2008 evaluation from nurse practitioner Monica Smith, NHS, indicating:

> Client reports being on Prozac for five years.
> Buspar was added in February 2008 and
> Trazadone in March. She reports difficulty

sleeping, gets five hours a night. She reports
Prozac is helping the depression but she
continues to be mildly depressed. Buspar is
controlling anxiety. She has mild to moderate
anxiety. She reports no problems with focus or
concentration but she does lack energy and
motivation. She denied any suicidal or
homicidal thoughts. She reports racing
thoughts and mood swings. She reports she's
easily angered and irritable. She denies
paranoia or hallucinations. She continues to
isolate and withdraw from people.

The diagnosis was Axis I - major depression, recurrent,
severe, without psychosis, Axis II - deferred, Axis III - back
injury, Axis IV - primary support group, and Axis V - GAF 45. The
treatment plan included discontinuation of Prozac, starting
Effexor, discontinuing Trazadone, a seven day trial of Rozerem for
sleep and a follow-up appointment in two weeks;

42. An April 11, 2008 therapy note from Shirley Juare, MSCP,
NHS, indicating Lively's mood was anxious and her progress was
"slow but steady." She had been "keeping busy by caring for her
children, cleaning house" but was anxious and worried about how her
husband would react to the divorce and how he would get even. The
plan was to continue to work on learning and implementing effective
strategies for managing symptoms of anxiety, decreasing the

negative impact the symptoms have on her ability to function, and increasing her self-esteem;

43. An April 23, 2008 progress note from Monica Smith, CFNP, NHS, indicating Lively complained of increased restlessness and irritability with Effexor, continuing feelings of depression and anxiety, and that she was still having mood swings and crying spells, but no suicide or homicidal ideations.

Ms. Smith reported Lively was cooperative, had an unremarkable appearance, normal activity level and affect, was oriented to person, place and time, had no psychosis, and was not a danger to herself or others. She discontinued the Prozac, started Effexor and Remeron, continued Buspar and Trazadone;

44. An April 25, 2008 Medical Necessity Assessment from NHS indicating that Lively reported moderate to severe levels of depression and anxiety. She also reported her twin girls were "big handfuls" and that, instead of dealing with her problems, e.g., financial situation, fear of retaliation from husband regarding divorce and child care issues, she ignored them and just kept herself busy. She also reported that adjusting to her new medications caused her to become irritable and restless;

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

45.  A May 9, 2008 office note from Monica Smith, CFNP, NHS, indicating that although Lively reported feeling high anxiety she was sleeping better. Smith noted that Lively was well-groomed, had normal activity level, speech and affect, was oriented to person, place and time, and did not appear to be at "an increased risk for danger to self or others";

46.  A May 30, 2008 Individual Treatment Plan from Shirley Juare, MSCP, NHS, indicating that Lively reported still feeling depressed with racing thoughts, and poor focus and concentration. Juare noted Lively was cooperative, had normal activity level and speech, appeared to be "in good spirits," was orientated to person, place and time, denied hallucinations, and voiced some suicidal ideations but no plan or intent.  Lively's list of medications included Celexa, Buspar, Vistaril, Remeron, and an addition of Wellbutrin;

47.  A  June 27, 2008 office note from NHS indicating Lively reported sleeping well, was having mood swings with anxiety, had improved depression, and was feeling sedated during the day after taking Vistaril. Medications listed were Celexa, Buspar, Vistaril, Remeron, Wellbutrin and an addition of Depakote.  The counselor noted Lively was cooperative, well groomed, had normal activity

level, speech and affect, was orientated to person, place and time, had no current hallucinations and no current suicidal ideations;

48.  A July 28, 2008 office note from NHS indicating that Lively reported some problems with falling and staying asleep and had some irritability. Lively noted that she had "significant improvement" with her new medication, Depakote, and, that when she did not have any more to take, she began experiencing anger, irritability and mood swings.  The counselor noted Lively was well groomed, had normal activity level, speech and affect, was orientated to person, place and time, was not having hallucinations, and was not at increased risk of danger to self or others;

49.  An August 18, 2008 progress note from NHS indicating that Lively reported having no difficulties, was sleeping well, normal mood and energy, feeling better with less frequent mood swings, less irritability, and less anxiety, and improved motivation and sleep. The counselor noted Lively was cooperative, well groomed, had normal activity level and speech, was orientated to person, place and time, appeared in good spirits, and presented no indications of being at an increased risk for danger to herself or others;

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

50.  An August 22, 2008 Medical Necessity Assessment from NHS indicating that Lively continued to struggle with her anxiety and depression, and scheduling a meeting with the treatment team to determine her interest in continuing with the service due to her failure to attend therapy sessions, and to stress the importance of keeping her appointments;

51. A September 10, 2008 consultative mental status examination report from John Atkinson, M.A., a psychologist, referencing a referral by Lively's attorney. The report indicated that Lively reported her chief reason for seeking disability was "um - - unipolar - - two bulging disks in my back," a diagnosis that Atkinson noted does not exist. When asked to describe her disability, Lively responded "um, - - - a panic attack, wouldn't be able to breathe, run out - avoid people - I can't stand and carry heavy things." She reported anxiety that occurred once a month and felt "like a heart attack" and lasted for about 15 or 20 minutes and was "therefore, not really a problem."  She reported feelings of irritability and agitation about once a week and a depressed mood over the past two weeks.

Mr. Atkinson found Lively had a wistful, subdued, preoccupied, and tense attitude, and reported that, during the examination, she

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

constantly jiggled her legs and sat rigidly forward. He further
noted adequate cooperation, normal gait, tentative social rapport,
subdued and depressed mood, diminished affect, average insight,
normal judgment, normal immediate and remote memory, moderately
impaired delayed memory, moderately deficient concentration, and
normal attention, reasoning, psychomotor behavior, persistence, and
pace.

Specifically, under SOCIAL FUNCTIONING, Mr. Atkinson noted
mildly deficient social functioning based on observation of social
interaction. He then noted:

> In summary, we see here a 28-year-old female
> who I see as a constitutional schizoid –
> obsessive type personality, suffering from
> feelings of social alienation and who feels
> like she is in this world but not of this
> world. She engages in obsessive ruminative
> thinking with a lot of fantasies, feels
> misunderstood, unloved and worthless and this
> appears to be a constitutional predisposition.
> It is noted that individuals of this type
> almost always show a very low life force and
> the patient displays this clearly, being more
> of an introverted, rather colorless
> individual.
>
> The patient did go through a period of mild
> acting out as a teenager but after that,
> lapsed back into her withdrawn and somewhat
> seclusive, morose brooding. Individuals of
> this type almost always suffer from chronic
> depression, which the patient clearly displays

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

and has always displayed, and this persists
despite treatment.

It is felt that the patient's problems have
been lifelong and probably will continue to be
in the foreseeable future and she simply lacks
the get-up and go capabilities for normal
social relationships, both at home, at school
or at work. Her tolerance for stress and
anxiety is very low and she withdraws under
pressure; this being compounded by depressive
avolition. Her impairments are felt to be
significant and chronic.

Mr. Atkinson diagnosed Axis I Major Depressive Disorder -
Recurrent, Severe without Psychotic Features, Axis II Schizoid-
Obsessive Personality Disorder, Axis III - see medical records,
Axis IV - financial and relational problems and Axis V - GAF 50[3]
serious impairment, current and past year.

Mr. Atkinson also stated that he found the Northwood records
"problematic" because the "psychiatric evaluations," in particular

---

[3] A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) **OR any
serious impairment in social, occupational, or school functioning**
(e.g., no friends, unable to keep a job)

A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect
and circumstantial speech, occasional panic attacks) **OR moderate
difficulty in social, occupational, or school functioning** (e.g.,
few friends, conflict with peers or coworkers). Diagnostic and
Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed.
1994). (Emphasis in original).

the April 4, 2008 evaluation, were not signed by a psychiatrist or medical doctor and therefore properly could not be called psychiatric evaluations. He further noted that, because he was aware of complaints against Northwood by the Office of Behavioral Health for activities such as billing for psychiatric reports when no psychiatrist was involved in making the report, etc., he regarded their opinions with "a grain of salt." He did, however, agree that Lively had Major Depression, recurrent, severe.

He listed Lively's medications as Hydroxyzine, Buspar, Remeron, Wellbutrin, Celexa, Norflex and Depakote. He observed that: "It is not clear why she is taking Depakote because Depakote is a medication for migraine headaches and the patient states she has never had migraine headaches."

Mr. Atkinson also completed a Mental Assessment of Ability to do Work-Related Activities form, and determined that Lively would have a "marked" limitation in her ability to relate to co-workers, deal with the public, deal with work stresses, and demonstrate reliability, a slight limitation in following work rules, maintaining attention, understanding, remembering and carrying out detailed but not complex instructions and maintaining personal appearance, a moderate limitation in using judgment, interacting

32

with supervisors, functioning independently, maintaining concentration, understanding, remembering and carrying out complex instructions, behaving in an emotionally stable manner and relating predictably in social situations, and no limitation in understanding, remembering and carrying out simple job instructions. The form defines "slight" as having some mild limitations but retaining ability to function well; "moderate" as the individual is still able to function satisfactorily; and "marked" as "There is a serious limitation in this area. The ability to function is severely limited but not precluded."

The form also expressly included the following instruction to the evaluator:

> IT IS IMPORTANT THAT YOU RELATE PARTICULAR MEDICAL FINDINGS TO ANY ASSESSED LIMITATION IN CAPACITY; THE USEFULNESS OF YOUR ASSESSMENT DEPENDS ON THE EXTENT TO WHICH YOU DO THIS.

Despite this directive, Mr. Atkinson failed to relate his medical findings directly to any of the limitations listed on his evaluation; and

52. A September 15, 2008 note from Steve Cordor, M.D., Northwood Health Services, indicating that Lively reported no problems with sleep, denied any symptoms of mania, depression or

33

anxiety, and stated that she had good response from her medication. Dr. Corder noted Lively had a pleasant attitude, normal affect, and was well-groomed. He instructed her to continue her medications, Celexa, Buspar, Vistaril, Remeron, Wellbutrin and Depakote.

## VI. **LIVELY'S TESTIMONY**

At her September 22, 2008, administrative hearing, Lively testified that she lived in a second floor apartment with her three children, a five year old daughter and nine year old twin daughters, was separated from her husband, received no child support because her husband would not work, had a valid driver's license but no car, and depended on her mother to drive her to appointments and to do the grocery shopping. She reported that she receives $542.00 in food stamps a month, a $22 dollar check for her utilities, and assistance with her income based rent.

Lively stated that the most serious problem affecting her ability to work was her back, but that her anxiety and depression also kept her from working. Her daily activities include getting up at 6:45 to get her children ready for school, watching television, doing light housework such as dusting, occasional grocery shopping with her mother, and fixing dinner. She stated that her mother did the vacuuming and the grocery shopping and that, when she did go

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

grocery shopping with her mother, she pushed her mother to get done because she wanted to leave the store because she did not like to be around people.

## VI. <u>DISCUSSION</u>

Lively objects that the ALJ erred in concluding that the opinion of Mr. Atkinson, an evaluating psychologist, is inconsistent with the record as a whole, and is not supported by substantial evidence. The Commissioner, however, contends that the ALJ properly evaluated Mr. Atkinson's opinion, gave it proper consideration, and assigned it a proper weight.

Mr. Atkinson evaluated Lively for disability analysis on only one occasion[4] and at the request of her attorney. After reviewing all of the evidence of record, the ALJ determined that Mr. Atkinson's findings of marked limitations in her ability to relate to co-workers, deal with the public, deal with work stresses, and demonstrate reliability were inconsistent with the other evidence of record, as well as his own report.

In the ALJ's review of the evidence, he specifically referenced:

_____

[4]    The ALJ references a second consultative psychological evaluation but the record contains only one report from Mr. Atkinson, Exhibit 10F.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

1.    The March 29, 2007 consultative examination report from M. Aileen Mansuetto, M.A., who determined that Lively had normal immediate and remote memory, moderately deficient recent memory, normal persistence and pace, and within normal limits social functioning during examination with good eye contact and appropriate social skills;

2.    The April 4, 2007 Mental Residual Functional Capacity Assessment from Philip E. Comer, Ph.D., in which he determined that Lively would be "moderately limited" in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, her ability to work in coordination with or proximity to others without being distracted by them, her ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, her ability to interact appropriately with the general public, her ability to get along with coworkers or peers without distracting therm or exhibiting behavioral extremes, her ability to respond appropriately to changes in the work setting, and her ability to travel in unfamiliar places or use public transportation. He concluded that Lively was not markedly

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

limited in any area and would not be significantly limited in any other functional area; and

3. The records from Northwood Health Services in which Lively generally reported no more than moderate problems, as well as improvement due to the medications prescribed.

Based on these records, the ALJ stated:

> The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding the undersigned has considered whether the 'paragraph B' criteria are satisfied. To satisfy the 'paragraph B' criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

(Administrative Law Judge Decision dated April 6, 2009, p. 18.)

20 C.F.R. § 404.1527 states:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

paragraph (d)(2) of this section, we consider
all of the following factors in deciding the
weight we give to any medical opinion

(1)    *Examining    relationship*.
Generally we give more weight to the
opinion of a source who has examined
you than to the opinion of a source
who has not examined you.

(2)    *Treatment    relationship*.
Generally, we give more weight to
opinions from your treating sources,
since these sources are likely to be
the medical professionals most able
to provide a detailed, longitudinal
picture    of    your    medical
impairment(s) and may bring a unique
perspective to the medical evidence
that cannot be obtained from the
objective medical findings alone or
from    reports    of    individual
examinations, such as consultative
examinations    or    brief
hospitalizations.  If we find that a
treating source's opinion on the
issue(s) of the nature and severity
of  your  impairment(s)  is  well
supported by medically acceptable
clinical and laboratory diagnostic
techniques and is not inconsistent
with the other substantial evidence
in [the] case record, we will give
it controlling weight. When we do
not  give  the  treating  source's
opinion controlling weight, we apply
the factors listed in paragraphs
(d)(2)(I) and (d)(2)(ii) of this
section, as well as the factors in
paragraphs (d)(3) through (d)(6) of
this section in determining the

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

> (4) *Consistency*.    Generally,  the  more
> consistent an opinion is with the record as a
> whole, the more weight we will give to that
> opinion.

In addition, 20 CFR § 404.1527(f)(2)(I) provides:

> Administrative law judges are not bound by any
> findings  made  by  State  agency  medical  or
> psychological  consultants,  or  other  program
> physicians or psychologists.  However, State
> agency medical or psychological consultants,
> or other program physicians or psychologists,
> are   highly   qualified   physicians   and
> psychologists who are also experts in Social
> Security disability evaluations.  Therefore,
> administrative  law  judges  must  consider
> findings  of  State  agency  medical  or
> psychological  consultants,  or  other  program
> physicians  or  psychologists,  as  opinion
> evidence,   except   for   the   ultimate
> determination about whether you are disabled.

The ALJ thoroughly reviewed the report of Mr. Atkinson and

noted the following:

> On September 10, 2008, John R. Atkinson, Jr.,
> M.A.,   performed   a   second   consultative
> psychological evaluation of the claimant.  Her
> attitude was wistful, preoccupied, tense and
> she was jiggling her legs throughout the
> evaluation. Social rapport was tentative. Her
> speech  patterns  tended  to  be  relevant,
> coherent and appropriate to the conversation.
> She was well oriented to time, place and
> person. Her observed mood was subdued and
> depressed and her affect was diminished. Her
> social functional was mildly deficient during
> the interview based on observation of social
> interaction.  She reported that she attends

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
───────────────────────────────────────────────

> church about every two months, makes no visits
> to friends but a neighbor comes to see her
> about every other day. She makes no visits to
> relatives or family and her brothers come to
> see her about once a week. She has no contact
> with her parents. She engages in no
> entertainment outside the home such as dinner,
> movies, clubs, eta., does not date and if
> people ask her out, she turns them down.
> Associations were relevant and the stream of
> thought is normal. No distortions of though
> content were noted, and no hallucinations or
> illusions were elicited. Her insight was
> average and judgment was within normal limits.
> Her immediately and recent memory were both
> moderately impaired. Remote memory was
> broadly intact.

In his review of all of the evidence of record, the ALJ noted that, in a July 28, 2008, Northwood Health Services progress note, written just two months before the Atkinson evaluation, Lively reported "significant improvement" with her new medication, Depakote. And, in an NHS progress note dated August 18, 2008, she reported that she was having no difficulties, was sleeping well, had normal mood and energy, had less frequent mood swings, less irritability, less anxiety, and improved motivation. At the September 10, 2008 evaluation with Mr. Atkinson, however, Lively reported feeling depressed most of the time, even with medication, experiencing anxiety about once a month for 15 or 20 minutes at a

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

time that felt "like a heart attack", and punching walls due to experiencing irritability.

Significantly, five days later, on September 15, 2008, Lively denied depression or anxiety to Dr. Steven Corder, a psychiatrist at NHS, and stated that the medication was helping her. Dr. Corder noted:

> There are no acute symptoms detected today. No reported problems with sleep. Denies any signs or symptoms of mania. The patient denies depression or anxiety. Denies any problems with medications. Reported she continues to have good response with her medications, 'they help with my depression and anxiety.' Nothing unusual or bizarre indicated today. Attitude is pleasant today. Appears well groomed. Activity level is normal. Speech is focused. Affect is normal. Oriented to person, place and time. No psychosis. As a result of my assessment the patient has no indications of being at an increased risk for danger to self or others.

After thoroughly reviewing all of the evidence of record, the Magistrate Judge determined that the record contained substantial evidence supporting the ALJ's determination that Mr. Atkinson's opinion regarding the severity of Lively's limitations was inconsistent with the record as a whole.

Using DMS-IV Code 301.20, the code number for schizoid personality disorder only, Mr. Atkinson diagnosed Lively with

schizoid-obsessive personality disorder. As noted by the Magistrate Judge, however, one of the characteristics of an individual with Schizoid Personality Disorder is "a seeming indifference to the approval or criticism of others," which is in contradiction to Lively's own statements that she cannot work because she feels that "everyone was watching me and I could not handle that feeling so I walked out," and  "I feel like everyone looks at me like I am stupid and I can't handle the jobs."

The DSM-IV states that  individuals with Obsessive-Compulsive Personality Disorder "may also show an apparent social detachment that stems from a devotion to work and discomfort with emotion. The record in this case clearly demonstrates that Lively has only worked on an extremely limited basis and has reported on numerous times that she cried or acted out angrily at work and at home.

In addition, the DSM-IV defines obsessions as "persistent ideas, thoughts, impulses, or images that are experienced as intrusive and inappropriate and that cause marked anxiety and distress" that are not "simply excessive worries about real life problems (e.g., concerns about current ongoing difficulties in life, such as financial, work, or school problems)." Throughout Lively's entire record, her medical reports repeatedly determine

that real-life, serious difficulties, including marital problems, financial problems, and child-care problems, are the root of her anxiety, and are devoid of any reference to persistent ideas unrelated to her real-life problems. The Magistrate Judge, therefore, concluded that the record does not contain substantial evidence to support Mr. Atkinson's diagnosis of schizoid-obsessive personality disorder, or obsessive-compulsive disorder, or his diagnosis of Major Depressive Disorder, because the ALJ specifically concluded that Lively's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." (Administrative Law Judge Decision dated April 6, 2009, p. 18.)

Importantly, even though the mental evaluation form instructed him to "[i]dentify that factors that support[ed his] assessment," and further instructed that "the usefulness of [his] assessment depend[ed] on the extent to which [he did] this," Mr. Atkinson failed to provide any factors supporting of his assessment. He also failed to provide any medical or laboratory findings supporting his opinion. His report reflects  only one clinical interview and mental status examination, but no test results, and it appears to be based primarily on Lively's subjective reports. As previously

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

noted, her reports to Mr. Atkinson differ greatly from reports given to her treatment providers around that same period of time.

Lively's report to Mr. Atkinson regarding her history also is inconsistent with the history she provided to other medical providers. Such inconsistencies include a report to Mr. Atkinson that she had not used marijuana since age 19, which differs from the report to NHS on the date of her admission to the crisis unit that she had smoked "a joint" of marijuana that morning. Additionally, while Lively originally reported that she quit college because she hated it, she told Mr. Atkinson she did not get up for classes due to depression.

Accordingly, the Magistrate Judge determined that there was substantial evidence in the record to support the weight assigned by the ALJ to Mr. Atkinson's opinion and diagnosis.

## VII. <u>CONCLUSION</u>

Following a careful review of Lively's objections, the Court concludes that she has not raised any issues Magistrate Judge kaull did not thoroughly consider in his R&R. Moreover, after an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances in this case. Therefore,

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

the Court **ACCEPTS** Magistrate Judge Kaull's R&R in whole, and **ORDERS** that this civil action be disposed of in accordance with the recommendation of the Magistrate Judge.  Accordingly,

1.   The defendant's motion for Summary Judgment (Docket No. 10) is **GRANTED**;

2.   The plaintiff's motion for judgment on the pleadings (Docket No. 9) is **DENIED**; and

3.   This civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

Pursuant to Fed.R.Civ.P. 58, the Court directs the Clerk of Court to enter a separate judgment order and to transmit copies of this Order to counsel of record.

DATED: March 25, 2011.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE